UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON CLAUDE EDWARDS, | No. 2:20-cv-00530 TLN GGH P |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATIONS |
| RON GODWIN, Acting Warden,[1] | |
| Respondent. | |

*Introduction and Summary*

Petitioner, a state prisoner proceeding through counsel, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 626(b)(1) and Local Rule 302(c).

This is a tough case. Petitioner went to trial on child molestation charges—charges which carried a potential of life imprisonment. The first trial ended in a hung jury (7-5 on a pair of

---

[1] "A petitioner for habeas corpus relief must name the state officer having custody of him or her as the respondent to the petition." Stanley v. California Supreme Court, 21 F.3d 359, 360 (9th Cir. 1994) (citing Rule 2(a), 28 U.S.C. foll. § 2254). The court is required to consider *sua sponte* whether the named respondent has the power to provide the relief sought in a habeas corpus action. See Smith v. Idaho, 392 F.3d 350, 355 n.3 (9th Cir. 2004). Ron Godwin, current acting warden of the Pleasant Valley State Prison, is substituted as respondent. See Stanley, 21 F.3d at 360.

1

charges, and 10-2 on another pair of charges—both in favor of petitioner).  In between trials, the prosecutor offered a plea bargain which would have resulted in a sentence of six years in prison. Petitioner's trial attorney swatted the offer away claiming to the prosecutor that her client would never accept the deal. The problem is that the plea offer was *never* communicated to petitioner. He went to trial a second time, was found guilty, and was sentenced to 38 years to life in prison.

In his habeas petition, petitioner claims his counsel was ineffective. It is conceded that the first prong of <u>Strickland v. Washington</u>, 466 U.S.668 (1984) (unreasonableness of counsel's actions) has been met.  Prejudice is the question before this court.  For the reasons that follow, although the legal standard used by the state courts was not itself AEDPA unreasonable, the fact-finding process was, in that it left out a critical element of analysis. Based on the following, the petition should be granted.[2]

*Factual Background*

The underlying facts are not in dispute, and the following are taken from the California Court of Appeal First Appellate District ("Court of Appeal") opinion, <u>People v. Edwards</u>, No. A143581, 2018 WL 4144096, at *1-4 (Cal. Ct. App. Aug. 30, 2018) (footnotes omitted):

> The jury was unable to reach a unanimous verdict on the trial of defendant Jason C. Edwards (Edwards) on two counts of oral copulation and two counts of lewd conduct, all involving his girlfriend's two minor daughters.  Shortly before the retrial, the prosecution offered a plea deal in which Edwards would plead guilty to one count of lewd conduct, serve a prison term of six years, register as a sex offender (Pen. Code, § 290)1 and possibly be subject to commitment as a sexually violent predator (Sexually Violent Predators Act (Welf. & Instit. Code, § 6600, et seq.) ). Defense counsel replied to the prosecutor that Edwards was unlikely to agree and did not communicate the offer to Edwards. At the retrial, the jury convicted Edwards on all counts, and the judge sentenced Edwards to 38 years to life in state prison. The parties agree that defense counsel provided constitutionally ineffective representation when she failed to inform him of the prosecution's plea offer, but dispute whether there was a reasonable likelihood Edwards would have accepted the plea. The trial judge decided Edwards did not meet his burden of demonstrating prejudice and denied the motion for a new trial. We affirm.

////

////

---

[2] The undersigned appreciates the well-written briefs from both parties.

2

# BACKGROUND

## A. Proceedings at Trial

An amended information charged Edwards with two counts of oral copulation with a child 10 years of age or younger (§ 288.7, subd. (b); Counts 1 and 2) and two counts of lewd conduct with a child under the age of 14 (§ 288, subd. (a); Counts 3 and 4). Edwards retained Amy Morton to represent him. At trial the two alleged victims—the twin daughters of Edwards's girlfriend—testified to instances of oral copulation of defendant and lewd conduct which occurred when they were five and again when they were eight and nine years old. Edwards testified that he never engaged in any of the conduct the twins described. Morton challenged the girls' reliability, arguing that their aunt coached them in response to Edwards's infidelity to her sister. After deliberating for three days, the jury informed the court it was deadlocked on all four counts. Questioned by the trial judge, the jury foreperson indicated that the jury was split seven to five on the oral copulation counts and ten to two on the lewd act counts. After confirming that nothing further would assist the jury in reaching a verdict, the court declared a mistrial. Jurors later advised counsel that as to every count, the majority of jurors voted to acquit.

The People elected to retry the case, but, 12 days before trial was to begin, the assistant district attorney sent defense counsel an email which contained a plea offer: "I am ready to proceed on Edwards. Offer is one count of PC 288(a), midterm, six years. He already has a couple of years['] worth of credit I think." Two days later defense counsel responded with an email: "Not happening. I'll convey to my client as required but 99.99999% not happening." There was no further communication between counsel about the offer.

At the second trial the prosecution presented much of the same evidence, including the testimony of the alleged victims, but, for the first time called an expert on the subject of child sexual assault accommodation syndrome. The defense added Dr. Howard Friedman, a neuropsychologist, who evaluated Edwards and testified that Edwards showed no sexual interest in children and that there was no indication that Edwards was trying to be deceptive. Edwards testified and denied all the alleged conduct. In response to questions about his interview with Dr. Friedman, Edwards said: "I was fully honest with him." On another topic, he testified: "I would never admit to something I didn't do." In closing, Morton argued that the victims' testimony was unreliable. The jury deliberated two days and found Edwards guilty on all four counts.

## B. Edwards's Motion for New Trial

After the second trial, Morton declared a conflict. The court granted her motion to be relieved and appointed the Office of the Alternate Public Defender (New Counsel). New Counsel filed a motion for new trial, alleging Morton had provided ineffective assistance by failing to advise Edwards of the prosecution's plea offer.

3

The motion was supported by Morton's declaration in which she stated that she believed she communicated an offer to Edwards and that "Mr. Edwards rejected the offer in large part, because he denied having any criminal liability for the charges he faced. [¶] ... [¶] ... I remember telling him that the offer was to plead to one count of 2 Pen. Code, § 288, with an 8 year sentence. [¶] ... [¶] ... I subsequently reviewed my file contents and was asked to locate an e-mail sent to me by Ms. Nguyen reflecting her offer.... [¶] ... [¶] I was very surprised to see that she had offered the mid-term of 6 years state prison. [¶] ... I can think of no independent corroborating evidence in existence to indicate that I ever conveyed the 6 year offer to my client. [¶] ... [¶] ... There is a possibility that I did not convey the proper offer to Mr. Edwards, and that I have substituted a memory in place of an actual event."

The People opposed the new trial motion, arguing that Edwards failed to demonstrate a reasonable likelihood that he would have accepted the offer. They contended Edwards had maintained his innocence throughout trial, " 'motivated by a persistent hope for exoneration.' " The People pointed to Morton's emailed response to the plea offer, in which she wrote that, though she would present the offer to Edwards "as required," there was a "99.99999" percent chance he would not accept it. They argued that Edwards's consistent position, his failure to initiate plea negotiations and the absence of a declaration from Edwards showed that he was not amenable to pleading guilty.

The declaration of assistant district attorney Mary Nguyen, counsel at both trials, included the jury votes of seven to five in favor of acquittal on the oral copulation counts and ten to two for acquittal on the lewd act counts. When she informed defense counsel of those favorable votes after the mistrial, Morton appeared "perplexed" that the People would retry Edwards given that outcome. Nguyen stated that the defense never initiated plea negotiations. The People attached the email correspondence between Nguyen and Morton about the plea offer and excerpts from Edwards's testimony at both trials, in which he denied the allegations.

Edwards filed a supplemental motion for new trial, acknowledging the need to corroborate his claim that he would have accepted the offer, and submitted a declaration which stated that he was never informed of the plea offer until after the second trial concluded. He stated that, after the first trial, he hoped that the People would offer a plea since the prosecutor had learned the defense strategy, making conviction more likely. "At this point I would have taken anything without being a life sentence. [¶] The possibility of being committed to a state hospital after serving my sentence would not have swayed my decision to accept the offer that was relayed to Ms. Morton. As I have always maintained the fact that I am innocent, I would have been confident that the doctors/staff of the facility I was committed to would have been able to easily determine that I'm not a danger to society and I would've been released soon thereafter." He did not ask Morton to initiate plea negotiations, because he was "naïve" and believed it was up to the People to initiate that process.

4

The motion relied on the discrepancy between the offer's six-year sentence and the risk of a life sentence and argued that a rational defendant, faced with that disparity, would have accepted the offer.

At the evidentiary hearing on the motion, Morton testified that—contrary to her prior written declaration—she was "quite certain" she did not communicate the plea offer to Edwards or instruct anyone else to do so. Morton said that she had not spoken to Edwards before informing the prosecutor that the plea offer was "not happening." She testified that she "would have broken his arm" to get him to accept it and believed Edwards would have accepted the offer, because he had been a reasonable client who followed her advice.

Morton acknowledged that Edwards had maintained his innocence throughout, including during the evaluation by Dr. Friedman, and that she had no reason to doubt it. She also testified that Edwards never sought to initiate a plea deal. Morton confirmed that she communicated the favorable jury votes to Edwards. Based on those results, she "strongly anticipated" the prosecution would not retry Edwards and was "surprised" when it did. Explaining the tone of her email rejecting the prosecution offer, Morton testified that she believed the prosecution case had "gone south" and that the retrial might not proceed. In response to questions about her prior declaration—which stated that she believed she conveyed the offer—Morton testified that she thought that was the truth. She also testified that—consistent with her practice—she would have advised Edwards at the outset of the representation about the Sexually Violent Predator Act.

At the hearing Edwards's mother testified that, after the first trial, Edwards told her that he was "tired" and that he did not want to go through a second trial. She testified that she never discussed a plea offer with Morton or with Edwards. She also acknowledged that her son had always maintained his innocence.

Edwards testified that Morton never discussed a plea offer, either for an eight-year or six-year prison term. He again testified that he was innocent and acknowledged that he had always maintained that position. Edwards was aware of the favorable jury votes at his first trial. He never asked Morton to pursue a plea deal on his behalf, assuming the prosecution would make an offer and that the "topic never came up." But, when asked about an offer, he said "if it was anything short of life, I would have taken it." He said that he would have accepted the six-year offer, though he knew that it would have required lifetime sex offender registration and the possibility of commitment under the Sexually Violent Predator Act. Citing the difference between a six-year prison term and the exposure if convicted at trial—60 years to life—which was too great to risk, Edwards reiterated that other consequences of the plea deal would not have deterred his acceptance of it, because he was most "concerned with just getting [his] freedom." In particular, he was not concerned about being evaluated for commitment as a sexually violent predator because he believed doctors would easily conclude he was not a threat. Nor was he concerned about the lifetime

requirement that he register as a sex offender. But, in conclusion, he acknowledged that he had previously testified " 'I would never admit to something I didn't do.' "

The trial court took the matter under submission and issued a written order denying Edwards's motion. The court first found that Morton's failure to convey the plea offer to Edwards constituted deficient performance. Next the court analyzed whether Edwards had been prejudiced, applying the factors set forth in In re Alvernaz (1992) 2 Cal.4th 924, 938 (*Alvernaz*). The court explained that the first two *Alvernaz* factors—whether counsel actually communicated the offer to Edwards and what advice, if any, counsel gave him—clearly favored Edwards. As for the third factor—the disparity between the terms of the plea offer and the probable consequences of proceeding to trial, "as viewed at the time of the offer"—the court explained that it considered the disparity here to be, at best, a "neutral objective factor" in light of Edward's knowledge of the favorable jury votes at his first trial.

However, the court found the fourth *Alvernaz* factor—whether Edwards indicated he was amenable to negotiating a plea bargain—decisive. The court found no objective evidence that Edwards had been amenable to a plea deal or that he would have willingly accepted the severe accompanying consequences. The court disputed Edwards's post-trial "unequivocal" statements that he would have accepted the offer if made aware of it and that he would have willingly accepted all of its consequences. The court recalled that Edwards had "testified forcefully in the presence of this Court that he was innocent of all the charges" and found his trial testimony that he "would never admit" something he did not do to be consistent with Edwards's failure to seek a plea bargain. The court found Edwards understood the charges against him and denied any culpability during the evaluation by Dr. Friedman, as he did at trial and with Morton and his mother. The court rejected Morton's claim that she would have "broken" Edwards's arm to get him to accept the offer: "When provided with the only offer ever conveyed to resolve the trial in the history of the case, Ms. MORTON opined she was '99.99999%' certain that her client would not accept a plea agreement." The court concluded Edwards had "failed to meet his burden of proof to establish objective evidence that he would have accepted the proffered plea bargain offer" and denied the motion.

The court sentenced Edwards on October 7, 2014, and Edwards filed a notice of appeal the same day.

The Court of Appeal affirmed the findings of the Superior Court.

*Legal Standards for Strickland Prejudice*

The legal test for Strickland prejudice in an AEDPA setting is succinctly stated in Cullen v. Pinholster, 563 U.S. 170, 189-190 (2011) (emphasis added):

////

6

> The Court also required that defendants prove prejudice. *Id.*, at 691–692, 104 S.Ct. 2052. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.*, at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Ibid.* That requires a *"substantial," not just "conceivable," likelihood of a different result*. *Richter*, *supra*, at 112, 131 S.Ct., at 791.
>
> Our review of the California Supreme Court's decision is thus "doubly deferential." *Knowles v. Mirzayance,* 556 U.S. 111, 123, 129 S.Ct. 1411, 1413, 173 L.Ed.2d 251 (2009) (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (per curiam) ). We take a "highly deferential" look at counsel's performance, *Strickland, supra,* at 689, 104 S.Ct. 2052, through the "deferential lens of § 2254(d)," *Mirzayance, supra,* at 121, n. 2, 129 S.Ct., at 1419, n. 2.

Insofar as prejudice from ineffective assistance of counsel has been specifically described in the plea bargain context *where a plea was not communicated or allowed to lapse*; the case to review is not initially <u>Lafler v. Cooper</u>, 566 U.S.156 (2012), but more correctly its on-point twin, <u>Missouri v. Frye</u>, 566 U.S. 134 (2012):

> To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law. To establish prejudice in this instance, it is necessary to show a reasonable probability that the end result of the criminal process would have been more favorable by reason of a plea to a lesser charge or a sentence of less prison time. *Cf. Glover v. United States*, 531 U.S. 198, 203, 121 S.Ct. 696, 148 L.Ed.2d 604 (2001) ("[A]ny amount of [additional] jail time has Sixth Amendment significance").
>
> This application of *Strickland* to the instances of an uncommunicated, lapsed plea does nothing to alter the standard laid out in *Hill*. In cases where a defendant complains that ineffective assistance led him to accept a plea offer as opposed to proceeding to trial, the defendant will have to show "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S., at 59, 106 S.Ct. 366. *Hill* was correctly decided and applies in the context in which it arose. *Hill* does not, however, provide the sole means for demonstrating prejudice arising from the deficient performance of counsel during plea negotiations. Unlike the defendant in *Hill*, Frye argues that with effective assistance he would have accepted an earlier plea offer (limiting his sentence to one year in prison) as

> opposed to entering an open plea (exposing him to a maximum sentence of four years' imprisonment). In a case, such as this, where a defendant pleads guilty to less favorable terms and claims that ineffective assistance of counsel caused him to miss out on a more favorable earlier plea offer, *Strickland 's* inquiry into whether "the result of the proceeding would have been different," 466 U.S., at 694, 104 S.Ct. 2052, *requires looking not at whether the defendant would have proceeded to trial absent ineffective assistance but whether he would have accepted the offer to plead pursuant to the terms earlier proposed.*
>
> In order to complete a showing of Strickland prejudice, defendants who have shown a reasonable probability they would have accepted the earlier plea offer must also show that, if the prosecution had the discretion to cancel it or if the trial court had the discretion to refuse to accept it, there is a reasonable probability neither the prosecution nor the trial court would have prevented the offer from being accepted or implemented. This further showing is of particular importance because a defendant has no right to be offered a plea, see *Weatherford*, 429 U.S., at 561, 97 S.Ct. 837, nor a federal right that the judge accept it, *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

Missouri v. Frye, 566 U.S. 134, 147-149 (2012) (emphasis added).

*Does AEDPA Apply Here?*

Petitioner contends that the California Supreme Court decision In re Alvernaz, 2 Cal. 4th 924 (1992), sets a standard different from that set by the U.S. Supreme Court, and is hence unreasonable. The undersigned disagrees. Comparing the description of Alvernaz prejudice requirement to that of Missouri v. Frye, one can find little difference:

| People v. Edwards, 2018 WL 4144096, at *4: | Missouri v. Frye, 566 U.S. at 148-149: |
|---|---|
| "To establish prejudice, a defendant must prove there is a reasonable probability that, but for counsel's deficient performance, the defendant would have *accepted the proffered plea bargain* and that in turn it would have been approved by the trial court." (*Alvernaz, supra*, 2 Cal.4th at p. 937[.]) | [Prejudice] requires looking not at whether the defendant would have proceeded to trial absent ineffective assistance but whether he would have *accepted the offer to plead pursuant to the terms earlier proposed.* [It also requires consideration of trial court approval.] |

Understanding that "reasonable probability" in the ineffective assistance context means something less than an actual. Rather, "[t]he likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011). In other words, a

////

substantial undermining of confidence in the outcome. The undersigned sees little, if any, daylight between the two definitions.

It is true, as pointed out by petitioner that within the broader framework above, the state courts analyzed several factors which more or less were built into the broader definition. The undersigned has reviewed the federal cases where the U.S. Supreme Court has criticized federal courts for substituting a factor driven test when the U.S. Supreme Court has not announced such an analytical framework. Federal courts, in reviewing the adherence of state courts to established U.S. Supreme Court authority have been told not to "refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013). See also Parker v. Matthews, 567 U.S. 37, 49 (2012) ("The highly generalized standard for evaluating claims of prosecutorial misconduct set forth in *Darden* [477 U.S. 168 (1986)] bears scant resemblance to the elaborate, multistep test employed by the Sixth Circuit here." But this is the U.S. Supreme Court relating to the *federal* courts not to substitute their own tests when reviewing whether state law decisions, with the highly deferential review afforded them. The undersigned is unaware of U.S. Supreme Court authority invalidating a state court's interpretation of U.S. Supreme Court authority simply because the state courts employ a multi-factored test within a broader definition when applying the constitutional precedents. State court interpretations must be AEDPA "unreasonable." That is, reasonable jurists could not square the state court's rendition of constitutional law with applicable U.S. Supreme Court decision:

> Said otherwise, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woodall*, 134 S.Ct. at 1702 (quoting *Richter*, 562 U.S. at 103, 131 S.Ct. 770). "AEDPA's requirements reflect a 'presumption that state courts know and follow the law,' " *Donald*, 135 S.Ct. at 1376 (quoting *Visciotti*, 537 U.S. at 24, 123 S.Ct. 357), and its "highly deferential standard for evaluating state-court rulings ... demands that state-court decisions be given the benefit of the doubt," *Cullen v. Pinholster*, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011) (quoting *Visciotti*, 537 U.S. at 24, 123 S.Ct. 357)."

////

1   Robertson v. Pichon, 849 F.3d 1173, 1182-83 (9th Cir. 2017).[3]

Having found that California law is not out of bounds with respect to adherence to Supreme Court substantive authority, the question is whether the state courts unreasonably applied it when making the factual determinations.

The factual underpinnings of application of established U.S. Supreme Court authority must also not be AEDPA unreasonable. 28 U.S.C. 2254 §§ (d)(2); (e)(1). The harmonization of these two subsections has caused some difficulty, but generally, both the process used to determine the facts, and the determination of the facts themselves based on the entire record may not be AEDPA unreasonable. In cases where the post-trial proceedings have permitted expansion of the trial court record, that evidence must show that the pertinent court was clearly and convincingly in error when determining the facts. Kipp v. Davis, 971 F.3d 939, 953-955 (9th Cir. 2020); Hurles v. Ryan, 752 F.3d 768, 790 (9th Cir. 2014); Murray v. Schriro, 745 F.3d 984, 1000-1001 (9th Cir. 2014).[4]

The factual findings are AEDPA unreasonable in that a factual component mandated by the U.S. Supreme Court was left unanalyzed. The critical analytical absence here is the potential effect upon petitioner's decision *that reasonable counsel advice would have made*. Although the fact that petitioner received no plea advice from counsel was noted by the trial court and the Court of Appeal as a factor favoring petitioner's position on prejudice, People v. Edwards, 2018 WL 4144096,at * 5, that was the end of the "advice" analysis. The entirety of the Superior Court and Court of Appeal discussion simply thereafter assumed that petitioner would have been making this decision entirely on his own, as if the plea offer would have been put before him

---

[3] The Ninth Circuit in Nunes v. Mueller, 350 F.3d 1045, 1054 n.3 (9th Cir. 2003) commented in dicta that a state court's factor laden test was in "tension" with the general rule set forth by the U.S. Supreme Court in Strickland. See also Perez v. Rosario, 459 F.3d 943, 947 n.2 (9th Cir. 2006). However, that dicta cannot form a rule that state court analyses of constitutional principles must follow the same format that federal courts are tasked with in reviewing U.S. Supreme Court authority. It is apples and oranges— review of state court formulations are highly deferential in AEDPA; review by the U.S. Supreme Court of lower federal court legal formulations in the AEDPA context are not.

[4] Neither party has requested a further evidentiary hearing, so the undersigned takes the facts of record as the record of this case.

1   without comment. Lafler has pertinence to the discussion here, and that pertinence stems from the

2   fact counsel's advice in the plea bargain process is *very* important.

> The Sixth Amendment requires effective assistance of counsel at critical stages of a criminal proceeding. Its protections are not designed simply to protect the trial, even though "counsel's absence [in these stages] may derogate from the accused's right to a fair trial." [citation omitted]. The constitutional guarantee applies to pretrial critical stages that are part of the whole course of a criminal proceeding, *a proceeding in which defendants cannot be presumed to make critical decisions without counsel's advice.*

Lafler v. Cooper, 566 U.S. at 165 (emphasis added).[5]

Frye's holding was again summarized in Lafler, 566 U.S. at 163 (emphasis added): "In the context of pleas a defendant must show the outcome of the plea process would have been different *with competent advice.*" And, the question here is not what Ms. Morton might have actually advised, if she had ever conveyed the plea offer, but what reasonable counsel would have advised.

Firstly, as seen from People v. Edwards, as quoted above, the state courts seemed to indicate that petitioner had received a "favorable" outcome at the first trial. To one who had been incarcerated for a substantial time, the incompleteness of the first trial outcome and the specter of a second trial were nothing to look forward to from petitioner's viewpoint. ECF No. 18-6 at 214. More importantly for the first trial, on two counts, petitioner had five jurors (and just before the final verdict six), who believed he was guilty beyond a reasonable doubt.  Seven jurors ultimately voted to acquit—but acquittal, of course, did not mean innocence. It simply meant that some jurors could not come to a conviction conclusion beyond a reasonable doubt. This was no ringing endorsement of petitioner's innocence protestations, and such should have been a factor in favor of petitioner's carefully considering the plea offer. While the other two counts were more in petitioner's favor (10-2), only two thought him guilty beyond a reasonable doubt, the entirety of the verdict was a very mixed bag. Reasonable counsel, in giving advice about the plea offer, would have made this crystal clear to petitioner.

---

[5] See also petitioner's cited cases of Turner v. Calderon, 281 F.3d 851, 881 (9th Cir. 2002); United States v. Blaylock, 20 F.3d 1458, 1467 (9th Cir. 1994).

Case 2:20-cv-00530-TLN-GGH   Document 30   Filed 02/18/21   Page 12 of 17

Secondly, reasonable counsel would have advised petitioner about the notorious potential for different juries to have different views from each other. Counsel would have advised that all jurors come to the trial process with a different mix of pertinent life experiences. While on infrequent occasion, those life experiences may be the subject of challenges for cause, most are far more likely to lie somewhere beneath the surface. For example, some jurors might be more receptive to children making up stories because they have seen their own children do so; conversely, some jurors may have seen one too many episodes of *Law and Order-SVU*, and come to the trial with a jaundiced eye (all the while saying that they can be fair and impartial). Counsel cannot predict who will walk into the courtroom for jury voir dire. And, even if counsel could figure out the juror's hidden "baggage," the roulette wheel of peremptory challenges might leave defense counsel with far too many potential, necessary challenges of jurors with an actuality of few or no challenges left. Petitioner deserved this advice.

Thirdly, no two trials proceed upon exactly the same path in terms of evidence or evidence receptivity. Children who were poor witnesses in the first trial might become more schooled in the second. A "tired" petitioner, after months of incarceration, may testify much more poorly than he did in the first trial, or lack confidence. See ECF No. 18-6 at 214. New witnesses, as occurred in this case, may be called. Trial judges are not robotic—different trial judges (and a different trial judge was assigned in this case) may have significantly different effects on the outcome of trial. Counsel would have to advise a defendant about these prospects.

Fourthly, the disparity of a potential life-in-prison sentence (an actuality here) with a six-year sentence (probably less for time served) is so great that reasonable counsel would surely have emphasized that point, i.e., "broken his arm."

Fifthly, in all probability, the acceptance of a plea offer would not have meant that petitioner would necessarily have admitted to all of the substance of the charges of record. In order to fashion a six year sentence, the charges with life imprisonment potential would most probably have been refashioned to a point where admission to the facts of a guilty plea might not have been so difficult for a defendant who believed either actually, or creatively in his own mind, that the charged, dastardly events never happened.

12

Surely, some of the adverse effects of accepting the plea offer would have to be considered as well—for example, the probability of lengthy period of time, if not life, registration as a sex offender. Perhaps, petitioner would have been civilly committed as an SVP (not likely). Petitioner would not have the benefit of an "exoneration." Counsel would have to talk about these as well.

The trial court, after the evidentiary hearing, placed much weight on the fact that Ms. Morton, either through foolish bravado, or otherwise, stated at the time the offer was conveyed to her by the prosecutor that she was 99.99999% sure that her client would take no plea offer, the fact remains that whether or not, as she later testified, she would have figuratively "broken petitioner's arm" to take the deal, reasonable counsel would have made the above points in stark detail regardless of any preconceived notion about petitioner's amenability to plea bargain.

But petitioner never had that chance—he never got that very necessary advice. It is AEDPA unreasonable in the situation where a *plea offer was never conveyed* to have ignored the potential effect of a reasonable counsel's advice, and postulate instead, that petitioner was so fixated on his innocence, simply because he did not "plead guilty" in front of the juries when he testified, or that he confirmed to a psychologist before the second trial that he believed he was innocent, that confidential advice from a lawyer who "had been there" would not shake him out of his preconceived beliefs. As defense counsel testified, she had many clients who believed in their innocence, or had stated such, who nevertheless ultimately took a plea deal. ECF No. 18-6 at 193-194. The undersigned could almost take judicial notice of this.

Reasonable counsel would also have urged petitioner to talk with trusted persons in his life, such as his mother, about the above points reasonable counsel would have made. See ECF No. 18-6 at 193. But petitioner never had that chance.

It is also important to point out that nothing in the record points to the well-known, totally "obstreperous defendant," who listens to no one but himself. If the record had indicated such, a

////

////

////

different result would obtain here.  But defense counsel testified to the contrary, and that is the evidence of record; there is no opposing evidence.[6]

The Superior Court and the Court of Appeal heavily relied on the fact that petitioner, himself, never initiated plea bargaining (through his counsel, of course).  But the record is vague as to any possibility of plea-bargaining discussions, if any, even if very preliminary, between counsel and petitioner, and the drawing of an adverse inference from vagueness, is unreasonable. The only clear *testimony* on the issue is petitioner's not unreasonable belief that the prosecution would have to start the plea-bargaining process. ECF No. 18-6 at 212, 219. [7] But, in any event, if counsel never even brought up the potential for a plea-bargaining process with her client, regardless of which side would initiate the first foray, such would be unreasonable as well.

The undersigned understands the decision here does not depend simply on whether the undersigned believes the state courts got it right or wrong.  The decision here hinges upon the unreasonableness of not assessing the plea acceptance potential of an experienced counsel's advice to a cooperative client when that advice would surely have been given. Because the absence of analysis on the effect of reasonable advice takes the determination out of AEDPA, i.e., the decision is *de novo*, the undersigned, after much reflection, arrives at a different prejudice conclusion than did the state courts. There is a substantial potential of a different outcome if such

---

[6]

> Q.  The time you represented Mr. Edwards[,] was he a reasonable client?
>
> A. Always.
>
> Q. Followed your directions?
>
> A. Absolutely.
>
> Q. Followed your advice?
>
> A. Yes.

ECF No. 18-6 at 177.

[7] Defense counsel hinted at very general, preliminary discussions with the prosecutor, ECF No. 18-6 at 176, but the testimony is too vague to be considered.

14

advice assessment had been made; at the very least, confidence in the prejudice outcome from the undisputedly unreasonable actions of defense counsel has been substantially undermined. As testified to by defense counsel: "And I had no doubt if I talked to Mr. Edwards, I am really positive I could have forced him to take it willingly if you will. *It's [going to trial] a very stupid risk*." ECF No. 18-6 at 176-177. Reasonable jurists would agree.

There is no doubt that a defendant can act stupidly. However, in assessing the entire record here, the undersigned finds it unreasonable to have placed petitioner in that category, after assessing the effect that reasonable counsel advice would have had on his decision. Surely, a good bit of tea leaf reading must be performed here, but that is the effect of failing to convey a plea offer *accompanied by reasonable advice*.

Finally, the court must assess whether the trial judge in this case would have ultimately accepted the plea bargain. No party takes issue with the fact that a great many criminal cases, indeed the vast majority, resolve by plea agreement. See People v. Segura, 44 Cal. 4th 921, 929 (2008). One could almost argue that there is a rebuttable presumption that a plea agreement reached by the parties to the criminal process will be approved.

> A plea bargain is a negotiated agreement between the prosecution and the defendant by which a defendant pleads guilty to one or more charges in return for dismissal of one or more other charges. (*People v. Segura* (2008) 44 Cal.4th 921, 930, 80 Cal.Rptr.3d 715, 188 P.3d 649 (*Segura* ).) The agreement must then be submitted to the trial court for approval. The court must tell the defendant that the court's acceptance of the proposed plea is not binding, that the court "may, at the time set for the hearing on the application for probation or pronouncement of judgment, withdraw its approval," and that if the court does withdraw its approval the defendant may withdraw the plea. (§ 1192.5.) Thus, " '[j]udicial approval is an essential condition precedent to the effectiveness of the "bargain" worked out by the defense and prosecution.' " (*Segura, supra*, at p. 930, 80 Cal.Rptr.3d 715, 188 P.3d 649.)

People v. Martin, 51 Cal. 4th 75, 79 (2010).

A court may reject a plea agreement which it deems is not "fair." People v. Segura, supra, 44 Cal. 4th at 931. This includes agreements which are not in the best interest of society. People v. Superior Court (Gifford), 53 Cal. App. 4th 1333, 1338 (1997).

////

Petitioner makes the case that—the split verdict and its consequent uncertainty in what would happen in the second trial, the hardship involved in calling the troubled children to again testify, and generally, the need to preserve judicial resources—would have indicated that the trial court would have accepted the agreement. Respondent did not address this argument in the Reply to the Traverse, and the undersigned considers it conceded.

*Remedy*

Within thirty days of adoption of these Findings and Recommendations, if the Findings and Recommendations are adopted, the plea offer referenced herein should be reoffered to petitioner.[8] If petitioner accepts the plea, and pleads guilty to appropriate charges, the judgments entered should be modified to reflect the terms of the plea agreement, and any concomitant sentencing provisions, e.g., credit for served time, parole, registration as a sex offender etc.— within sixty days after the plea agreement is reoffered. If such a reoffer and resentencing does not take place, petitioner should be released from custody.[9]

*Conclusion*

IT IS HEREBY RECOMMENDED that the writ of habeas corpus should be GRANTED, and petitioner should be reoffered the plea offer or released.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections

////

////

////

---

[8] Frye also mentioned the possibility of the prosecutor withdrawing the offer before it was accepted. However, there are no facts of record here suggesting that the prosecutor did not have the authority to advance the plea offer, nor does the record reflect any second thoughts on the part of the prosecutor.

[9] Because acceptance of the plea agreement by the trial court has been found to be a conceded fact herein, there is no point in requiring further trial court approval.

shall be served and filed within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: February 18, 2021

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE